## THE GLADIATOR.

### (District Court, S. D. New York. October 22, 1904.)

**1. COLLISION—TUGS MEETING IN EAST RIVER—INSUFFICIENT LOOKOUT.**

A tug leaving her slip on the Manhattan side of East river, with a car float on her side, intending to turn up the river, which movement was delayed by the necessity of clearing a ferryboat coming down, which she did not see in time to remain at her slip, *held* in fault for a collision between her tow and another tug, also coming down on the Brooklyn side, on the ground that she should have kept a more efficient lookout, her view up the river being obscured by her tow, which would have enabled her to sooner see the ferryboat, and that, after passing the same and agreeing with the other tug to pass starboard and starboard, she failed to promptly reverse or change her course up the river. The other tug also *held* chargeable with contributory fault for proceeding at unlawful speed, and for failure to stop and back when it became obvious that there was danger of collision.

In Admiralty. Suit for collision.

James J. Macklin, for libellant.

Wheeler, Cortis & Haight, for claimant.

ADAMS, District Judge. This action was brought by the libellant Emil K. Johnson, master of the tug Charles H. Senff, to recover the damage suffered by that tug from a collision with a car float in tow of the tug Gladiator, on the 3rd day of June, 1903, in the East River, near the Fulton Ferry slips on the Brooklyn side. The weather was fair and the tide ebb with a current of about 3 knots' strength.

It appears from the pleadings and testimony that the Senff, with a loaded car float on her port side, was proceeding from the foot of North Sixth Street, Brooklyn E. D., to Staten Island. The Gladiator, with a loaded car float on her port side, started for the claimant's dock at James slip on the Manhattan side of the river, at about 8.40 o'clock P. M. for Long Island City. As the Gladiator proceeded from her starting place, under full speed bells, intending to turn up the river under a starboard helm, and pursue a course in the middle of the river, or on the Manhattan side of the middle, the ferry-boat Oregon bound down the river from South Street, Brooklyn, to the foot of Roosevelt Street, Manhattan, approached the Manhattan shore and notified the Gladiator by a signal of two whistles that she would cross her bow. To this proposed manœuvre the Gladiator agreed by a similar signal and stopped her engines but it soon became evident to the Oregon that the proposed manœuvre could not be successfully carried out and she blew a signal of one whistle to which the Gladiator also assented. The Gladiator then started up again and the Oregon passed closely under her stern. As the vessels cleared, the Senff, then in about the middle of the river, approached on the Gladiator's port hand and blew her a signal of two whistles to which the Gladiator responded with a similar signal. The signals were repeated and the Gladiator then stopped and reversed. The Senff relying upon the agreed course starboarded her helm and proceeded towards the Brooklyn shore. The Gladiator under the effect of her reversing swung down the river and with her float struck the Senff on her starboard side, doing some dam-

age. The Gladiator though agreeing that the Senff should pass ahead, did not stop and reverse as soon as she should have done in view of the situation.

The collision happened a short distance from the Brooklyn shore in the vicinity of the Fulton Ferry slips, just below the Bridge. Both tugs were going ahead through the water at the time, the Senff under an accelerated speed from the effect of a jingle bell and the Gladiator notwithstanding her reversed engine, with sufficient force to seriously injure the Senff.

I find that the Gladiator was in fault for proceeding across the river and in the Senff's course, in violation of her agreement that the vessels should pass starboard to starboard. There was ample room for the Gladiator's intended course and doubtless if the Oregon had not interfered with the Gladiator, the latter would have kept to the Manhattan side of the river and the collision with the Senff would not have occurred. The difficulty was that the Gladiator was operating with her pilot's view of vessels coming down the river obscured by the cars on her float and her whole dependance was upon the lookout stationed upon the cars on the float. This man was unlicensed and giving directions to the pilot on the tug, who followed them in the navigation. The ferry-boat was not seen in time for the Gladiator to remain in her slip, as she should have done if she intended to let the ferry-boat pass ahead of her, and when a two whistle course, followed by a one whistle course, was agreed upon with the ferry-boat, difficulty was created which eventuated in the disaster. The Gladiator was, therefore, in fault for not being of sufficient height for the pilot to see over the cars and for not having an alert lookout, that is one who would see the ferry-boat in time to let her pass ahead or, in any event, to so arrange the Gladiator's movements that the movements of the ferry-boat would not throw her out of position to acquire a heading up the river in time to give down going vessels the room they would need. The effect of the Gladiator's navigation was to throw her across the river and create an impediment to navigation.

The next question in the case is whether the Senff was guilty of any fault contributing to the collision. She is charged: (1) In having the Gladiator on her starboard hand and in not giving way; (2) in not fully complying with the agreed course of two signals by keeping further towards Brooklyn; (3) excessive speed; and (4) in not stopping and backing.

1. Although she actually had the Gladiator on her own starboard bow, I do not think that can be regarded as a starboard hand situation. The Gladiator was bound up the river and a two whistle course was proper. A natural way of passing for the vessels was to go to the starboard of each other. The Gladiator's signals of two whistles advised the Senff that she considered such a course expedient.

2. The testimony shows that the Senff kept as far towards Brooklyn as she reasonably could. The collision was in close proximity to that shore.

3. The Senff, aided by the tide, was going about 9 miles per hour and thus violating the state statute. This, in connection with the next fault, was contributory to the collision.

4. It should have been apparent to the Senff that the Gladiator for some reason was not complying with a two whistle agreement but was going towards Brooklyn and that if the Senff kept on, collision would probably occur. When the Gladiator emerged from behind the Oregon, the strength of the current was on the port side of her float, with the necessary result of setting the tug and tow across the river. This should have been obvious to the Senff and her navigation arranged accordingly. The situation required stopping and backing on her part. Such action would have thrown her to the starboard and the collision doubtless been avoided by the Gladiator passing ahead. Instead of adopting this precaution, the Senff rang a jingle bell and the collision followed.

I conclude that both vessels were in fault and that the Senff is only entitled to recover half damages, with interest.

Decree accordingly, with an order of reference.